IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **NAFISAH WILLIAMS,**<br>      **Plaintiff,** | **CIVIL ACTION** |
| **v.** | |
| **ADVANCED URGENT CARE,**<br>      **Defendant.** | **NO.  14-6347** |

**DuBois, J.**                                                                                                   **August 25, 2016**

### M E M O R A N D U M

### I.     INTRODUCTION

This is an employment discrimination case. Plaintiff Nafisah Williams worked for defendant Advanced Urgent Care as a medical assistant. Plaintiff alleged in her Complaint that defendant's owner, Dr. Mehdi Nikparvar, who is not a party in this action in his individual capacity, implemented race-based policies for the triage of patients and used racial slurs. After plaintiff objected to this conduct, she was fired by defendant. Plaintiff asserts claims for race discrimination, hostile work environment, and wrongful termination under 42 U.S.C. § 1981.

Defendant, a Pennsylvania corporation, was initially represented by counsel in this action. After the Court granted counsel's Motion for Leave to Withdraw, defendant failed to obtain new counsel, notwithstanding the obtaining of several extensions of time for doing so. By Order dated March 2, 2016, the Court directed the Clerk of Court to enter a default against defendant for failure to comply with prior Orders to retain counsel, and a default was entered against defendant on that date. On March 30, 2016, plaintiff filed a Motion for Default Judgment. The Court granted the Motion by Order dated July 28, 2016, and entered judgment in favor of plaintiff and against defendant in an amount to be determined by the Court after a hearing to assess damages. A damages hearing was held on August 9, 2016. Also before the

Court is plaintiff's counsel's Petition for Attorneys' Fees.

Based on the following Findings of Fact and Conclusions of Law, judgment is entered in favor of plaintiff and against defendant in the total amount of $107,904, consisting of back pay in the amount of $7,904, compensatory damages in the amount of $50,000, and punitive damages in the amount of $50,000. The Court also grants plaintiff's counsel's Petition for Attorneys' Fees and awards counsel for plaintiff fees pursuant to 42 U.S.C. § 1988 in the amount of $18,550.

## II.  PROCEDURAL BACKGROUND

Plaintiff filed her Complaint in this action on November 5, 2014. Plaintiff asserts claims against defendant for (1) race discrimination/harassment and hostile work environment under 42 U.S.C. § 1981; (2) retaliation and wrongful termination under 42 U.S.C. § 1981; (3) wrongful termination in violation of the Pennsylvania Whistleblower Act, 43 P.S. § 1422; and (4) wrongful termination under Pennsylvania common law. Defendant waived service of process pursuant to Federal Rule of Civil Procedure 12.

On December 31, 2014, Arsen Kashkashian Jr., Esq., entered his appearance on behalf of defendant. On the same date, defendant, through counsel, filed an Answer to the Complaint. Following a preliminary pretrial conference, the Court issued a Scheduling Order dated February 11, 2015.

At the request of the parties, by Order dated May 13, 2015, the Court vacated the Scheduling Order, referred the case to United States Magistrate Judge Thomas J. Rueter for settlement conferencing, and directed the parties to report within seven days of the last settlement conference. Judge Rueter conducted a settlement conference with the parties on June 4, 2015.

On September 9, 2015, the parties having failed to report on settlement conferencing, the

Court directed that the parties jointly report with respect to the status of the case. On September 9, 2015, Mr. Kashkashian filed a Motion for Leave to Withdraw as counsel for defendant.

The Court conducted a hearing on the Motion for Leave to Withdraw on November 13, 2015. The owner of defendant, Dr. Mehdi Nikparvar, was present at the hearing. At the hearing, the Court stated the following to Dr. Nikparvar:

> The Motion for Leave to Withdraw sets forth valid grounds for withdrawing as counsel. So absent a change of position, and it would have to be the doctor's [Nikparvar's] change of position, that Motion will be granted. That leaves Advanced Urgent Care without an attorney. As a corporation, it cannot be represented by someone who is not an attorney, so the doctor will have to retain counsel.

Nov. 13, 2015, Hr'g Tr., at 4:19–25. The Court further explained that:

> I'm going to grant Mr. Kashkashian's Motion for Leave to Withdraw and give you 30 days to retain counsel and provide that the attorney must enter his appearance within the 30-day period. And if you need more time, you'll write to me. You can't just ignore this.

Nov. 13, 2015, Hr'g Tr., at 8:11–16.

By Order dated November 13, 2015, the Court granted the Motion for Leave to Withdraw and provided defendant thirty days to obtain counsel. By Order dated December 11, 2015, at defendant's request, the Court extended this time by an additional forty-five days. Finally, by Order dated February 3, 2016, having heard nothing further from defendant and no attorney having entered an appearance on defendant's behalf, the Court *sua sponte* extended the time for defendant to obtain new counsel by an additional twenty days. In that Order, the Court provided that "failure of defendant to comply with this Order will result in the entry of a default against defendant, Advanced Urgent Care, for failure to obtain counsel." Each of these Orders was served on defendant and on Dr. Nikparvar via certified mail.

No attorney entered an appearance on behalf of defendant and the Court did not receive

further correspondence from Dr. Nikparvar or a representative of defendant. By Order dated February 29, 2016, the Court directed the Clerk of Court to enter a default against defendant for failure to appear, plead, or otherwise defend, and that was done.

Plaintiff filed a Motion for Default Judgment on March 30, 2016. On April 4, 2016, the Court received a letter from William J. Weiss, Esq., who stated that an employee of defendant asked that he represent it in this case. Mr. Weiss did not enter an appearance on behalf of defendant.[1] On April 8, 2016, Donald Moser, Esq., entered an appearance on behalf of defendant.[2] By Orders dated May 5, 2016, and June 17, 2016, the Court twice extended the deadline for defendant to respond to the Motion for Default Judgment and each Order was served on defendant, Dr. Nikparvar, Mr. Weiss, and Mr. Moser. Notwithstanding notice, defendant did not file a response to the Motion for Default Judgment.

By Order dated July 28, 2016, the Court granted plaintiff's Motion for Default Judgment in an amount to be determined by the Court at a damages hearing scheduled for August 9, 2016. That Order directed all counsel and a representative of defendant to appear at the hearing. This Order was served on defendant, Dr. Nikparvar, and all counsel.

On August 9, 2016, the Court conducted the damages hearing. Neither Dr. Nikparvar nor any other representative of defendant appeared at the hearing. Subsequently, plaintiff submitted Proposed Findings of Fact and Conclusions of Law. In addition, plaintiff's counsel submitted a

---

[1] At the damages hearing, Mr. Weiss informed the Court that he attempted to enter his appearance in this matter but was unable to do so because he is not a member of the bar of this Court. Aug. 9, 2016, Hr'g Tr., at 3:20–23.

[2] Since entering his appearance, Mr. Moser has done nothing in the case and he did not file a response to the Motion for Default Judgment. At the damages hearing, Mr. Moser and Mr. Weiss appeared but informed the Court that they had been unable to speak with Dr. Nikparvar and had not received any fees since Mr. Moser entered his appearance in April. Aug. 9, 2016, Hr'g Tr., at 4:3–11. Mr. Moser stated that he wanted to withdraw his appearance. He was directed by the Court to file a motion for leave to withdraw and serve that motion on defendant. *Id.* at 7:5–14. As of the date of this Memorandum, he has not done so.

Petition for Attorneys' Fees.

### III.     FINDINGS OF FACT

1.     Plaintiff is an African-American woman.

2.     Defendant operates urgent care centers at seven locations in the Philadelphia area.

3.     In September 2013, defendant hired plaintiff to work as a medical assistant at defendant's City Line Avenue location in Philadelphia, Pennsylvania.

4.     Dr. Mehdi Nikparvar is the owner of defendant.

5.     Dr. Nikparvar maintained a policy in which patients were prioritized to be seen by medical personnel based on race, rather than in the order in which they arrived or based on medical need. Dr. Nikparvar instructed defendant's employees to send all white patients for consultations with medical personnel before seeing African-American patients.

6.     Dr. Nikparvar monitored the waiting rooms at defendant's various locations using security cameras.

7.     If Dr. Nikparvar observed employees violating his race-based policy, he would instruct managers to discipline those employees.

8.     On at least one occasion, Dr. Nikparvar personally reprimanded plaintiff for sending an African-American patient for treatment while a white patient remained in the waiting room. When plaintiff objected to this instruction, Dr. Nikparvar told plaintiff that if she did not comply with the policy she would be fired.

9.     In October 2013, a manager at defendant's City Line Avenue location held a staff meeting at which the manager told all employees at the location, including plaintiff, that Dr. Nikparvar did not want white patients waiting in the waiting room and "that if we [did not] follow through with what he told us, he was going to fire us one by one." Aug. 6, 2016, Hr'g Tr.,

5

at 20:17–21.

10. Dr. Nikparvar regularly used racial slurs to refer to African-American patients and staff.

11. On one occasion, Dr. Nikparvar told an African-American patient at the City Line Avenue location that he was "just a stupid nigger" who "didn't even graduate high school." Aug. 6, 2016, Hr'g Tr., at 21:16–25.

12. In December 2013, defendant's City Line Avenue location was burglarized. Following the burglary, Dr. Nikparvar changed the locks at all of defendant's locations and provided only white employees with keys.

13. When challenged with respect to the decision to only give keys to white employees, plaintiff heard Dr. Nikparvar explain that "if you don't like it leave, I'm not risking my business for you niggers." Aug. 6, 2016, Hr'g Tr., at 23:20–24:3.

14. In 2014, defendant transferred plaintiff to its Montgomeryville, Pennsylvania, location.

15. Soon after the transfer, defendant hired additional staff at the Montgomeryville location. Dr. Nikparvar informed plaintiff that he wanted only white employees to be hired.

16. In May 2014, Dr. Nikparvar directed plaintiff's co-worker to fix a television in the waiting room at the Montgomeryville location. When the co-worker was unable to fix the television, Dr. Nikparvar, in plaintiff's presence, told the co-worker that she was "just a useless nigger." Aug. 6, 2016, Hr'g Tr., at 29:2–25.

17. As a result of Dr. Nikparvar's comments and actions, plaintiff felt traumatized and humiliated, but was unable to leave because she needed her job to support herself.

18. Also in May 2014, plaintiff had a dispute with a patient regarding scheduling of

an appointment with a dentist at the Montgomeryville location. Following the dispute, the patient spoke to Dr. Nikparvar about the incident. Dr. Nikparvar then fired plaintiff.

19. When plaintiff asked Dr. Nikparvar why she was fired, he told her that she was "loud," "ignorant," "disrespectful," and "nothing but a nigger just wasting his time." Aug. 6, 2016, Hr'g Tr., at 33:4–6. After plaintiff objected, Dr. Nikparvar informed her that he would not "put [his] business on the line for a nigger." Aug. 6, 2016, Hr'g Tr., at 33:11–13.

20. Plaintiff continues to feel anxious and depressed following her treatment by Dr. Nikparvar and she thinks about Dr. Nikparvar's conduct every day.

21. After she was fired, plaintiff's experience at defendant made it more difficult to find employment. At one job interview after she was fired, plaintiff was so nervous that she was unable to breathe normally and assemble an injection needle as asked by the interviewer, even though plaintiff had performed this simple task many times. Plaintiff was not offered a job following that interview.

22. While working for defendant, plaintiff earned $12.00 per hour and worked approximately forty hours per week.

23. After she was fired in May 2014, plaintiff was unemployed for approximately two months.

24. In July 2014, plaintiff obtained a new job, at which she earned $12.00 per hour, but worked only approximately twenty-eight hours per week.

25. In February 2015, plaintiff became a full time employee at her new job, earning $12.00 per hour for forty hours per week.

**IV. CONCLUSIONS OF LAW**

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 1367.

7

Defendant's liability under 42 U.S.C. § 1981 has been established through the issuance of a default pursuant to Federal Rule of Civil Procedure 55. *See, e.g.*, *Belmonte v. Spitzer*, No. 09-cv-4715, 2010 WL 2195651, at *1 (D.N.J. May 27, 2010) ("Default establishes the defaulting party's liability for the well-pleaded allegations of the complaint."); *Transportes Aereos de Angola v. Jet Traders Inv. Corp.*, 624 F. Supp. 264, 266 (D. Del. 1985).

A default judgment, however, "does not establish liability for the amount of damages claimed by the plaintiff." *Belmonte*, 2010 WL 2195651, at *1. "If the damages are not for a 'sum certain or for a sum which can by computation be made certain,' the 'court may conduct such hearings or order such references as it deems necessary and proper.'" *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990) (citation omitted) (quoting Fed. R. Civ. P. 55(b)(1)–(2)).

### A.    Back Pay

Plaintiff may recover damages for back pay following an unlawful termination under 42 U.S.C. § 1981. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 453, 459 (1975). Back pay is measured as "the difference between the actual wages earned and the wages the individual would have earned in the position that, but for discrimination, the individual would have attained." *Gunby v. Pennsylvania Elec. Co.*, 840 F.2d 1108, 1119–20 (3d Cir. 1988).

While employed by defendant, plaintiff earned $2,080 per month. Following her termination by defendant, plaintiff earned nothing for two months. During this period, plaintiff's lost wages totaled $4,160. After two months, plaintiff was able to partially mitigate her damages. From July 2014 until February 2015, plaintiff earned approximately $1,456 per month, $624 per month less than she earned while employed by defendant. During this period, plaintiff's lost wages totaled $3,744. Beginning in February 2015, plaintiff fully mitigated her damages.

Thus, Plaintiff's total lost wages following her termination were $7,904 and the Court awards plaintiff that amount in back pay damages.

### B. Compensatory Damages for Emotional Distress

Plaintiff may recover compensatory damages for emotional distress under 42 U.S.C. § 1981. *See Johnson*, 421 U.S. at 460. Compensatory damages may include damages for "emotional distress and humiliation" and "emotional pain and suffering." *Gunby*, 840 F.2d at 1121. Plaintiff may support an award for emotional distress based solely on her own testimony. *See, e.g.*, *Block v. R.H. Macy & Co., Inc.*, 712 F.2d 1241 (3d Cir. 1983). Under § 1981, compensatory damages for emotional distress are not capped. *See, e.g.*, *Holt v. Pennsylvania*, Civil Action No. 10-5510, 2015 WL 4944032, at *29–30 (E.D. Pa. August 19, 2015) (reviewing recent cases considering emotional distress damages in E.D. Pa. ranging from $50,000 to more than $250,000); *Zielinski v. SPS Technologies LLC*, Civil Action No. 10-3106, 2011 WL 5902214, at *9–10 (E.D. Pa. Nov. 22, 2011) (remitting jury award of emotional distress damages to $100,000 in national origin discrimination case); *see also Bolden v. SEPTA*, 21 F.3d 29, 33–34 (3d Cir. 1994) (affirming jury award of $250,001 in emotional distress damages in §1983 case).

Plaintiff's testimony shows that defendant's harassment and treatment of plaintiff caused her emotional distress. Specifically, Dr. Nikparvar's treatment of plaintiff caused her anxiety and depression that continues today, and, in at least one instance, negatively impacted her ability to find other employment. The Court concludes that an award of $50,000 will reasonably compensate plaintiff for these noneconomic damages.

### C. Punitive Damages

Punitive damages are available under 42 U.S.C. § 1981. *See Johnson*, 421 U.S. at 460. Under § 1981, punitive damages are appropriate against a defendant "for the intentionally

discriminatory conduct of its employee only if the employee served the employer in a managerial capacity, committed the intentional discrimination at issue while acting in the scope of employment, and the employer did not engage in good faith efforts to comply with federal law." Third Circuit Model Civil Jury Instructions § 6.4.1 (citing *Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 545–46 (1999)). Punitive damages are appropriate to punish the intentional discrimination of a defendant who acts "with malice or reckless indifference to federally protected rights." *Vitalis v. Sun Constructors, Inc.*, 481 F. App'x 718, 729 (3d Cir. 2012) (citations and quotations omitted) (discussing punitive damages in Title VII context). "[E]gregious or outrageous acts may serve as evidence supporting an inference of the requisite 'evil motive.'" *Kolstad*, 527 U.S. at 539. In assessing the amount of punitive damages, the Court should consider (1) "the degree of reprehensibility of the defendant's" conduct, (2) the disparity between the harm suffered by plaintiff and the punitive damages award, and (3) the difference between the amount of punitive damages and the civil penalties authorized or imposed in comparable cases. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996).

The Court concludes that punitive damages are appropriate in this case. Dr. Nikparvar was the owner and manager of the defendant. Dr. Nikparvar not only displayed racist animus toward plaintiff personally, as shown in his repeated use of racial slurs and explicitly racist conduct, but also maintained policies of differentially treating patients and hiring staff based on race. Defendant's actions in this case cannot be interpreted as good faith efforts to comply with federal law. Rather, they are egregious and outrageous acts.

To punish the intentionally discriminatory acts of defendant, the Court concludes that an award of $50,000 in punitive damages is appropriate based on consideration of the factors

identified in *Gore*.[3] *See Gore*, 517 U.S. at 575. Defendant's conduct demonstrated intentional malice towards African-Americans based on their race and was reprehensible. *See id.* at 575–76. Furthermore, a ratio of punitive damages to compensatory and back pay damages of less than one is reasonable. *See id.* at 580–81. Finally, this punitive damages award is within the statutory maximum that would apply were this case brought pursuant to Title VII, rather than 42 U.S.C. § 1981. *See* 42 U.S.C. § 1981a (capping punitive damages in Title VII action against employer with less than 101 employees at $50,000).

## V. ATTORNEYS' FEES

Plaintiff's counsel filed a Petition for Attorneys' Fees.[4] For the reasons that follow, the Court grants the Petition for Attorneys' Fees, but will reduce the amount sought.

42 U.S.C. § 1988 provides that "[i]n any action . . . to enforce a provision of section[] 1981 . . . of this title . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs . . . ." To determine the amount of fees, courts apply "the 'lodestar' formula, which requires multiplying the number of hours reasonably expended by a reasonable hourly rate." *Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346, 358 (3d Cir. 2001) (citations and quotations omitted). "The plaintiff bears the burden of producing sufficient evidence of what constitutes a reasonable market rate for the essential character and complexity of the legal services rendered in order to make out a prima facie case." *Id.* at 361 (citations and

---

[3] Other courts have affirmed punitive damages in equal or greater amounts in cases of less egregious conduct. *See, e.g.*, *Holt v. Pennsylvania*, Civil Action No. 10-5510, 2015 WL 4944032, at *31–32 (E.D. Pa. Aug. 19, 2015) (affirming $50,000 in punitive damages in case in which plaintiff was not fired or demoted but was subject to hostile work environment based on racist animus of defendants); *Lafate v. Chase Manhattan Bank*, 123 F. Supp. 2d 773, 789–90 (D. Del. 2000) (affirming $100,000 punitive damages award in case in which defendant did not engage in race-based retaliation, but "merely permitted the retaliation to continue").

[4] In the instant Petition for Attorneys' Fees, plaintiff's counsel does not seek an award of other costs.

quotations omitted). Having determined the applicable reasonable market rate, the court must then "review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described, and then exclude those that are excessive, redundant, or otherwise unnecessary." *Id.* at 362 (citations and quotations omitted). "[I]n determining whether the fee request is excessive, the court will inevitably be required to engage in a fair amount of 'judgment calling' based upon its experience with the case and its general experience as to how much time a case requires." *Id.*

Plaintiff is the prevailing party in this action. Plaintiff's counsel seeks fees under 42 U.S.C. § 1988 on behalf of two attorneys who worked on this case, Richard Swartz, Esq., and his associate Daniel Horowitz, Esq. Mr. Swartz seeks an hourly rate of $500 per hour and avers that he worked on the case for 14.4 hours. Mr. Horowitz seeks an hourly rate of $350 and avers that he worked on the case for 65.3 hours.

With respect to Mr. Swartz's rate, the Court concludes that $500 per hour is reasonable. Mr. Swartz has almost twenty-years of experience in the field of employment discrimination litigation. Mr. Swartz's proposed rate is within the range suggested by Community Legal Services for an attorney with his experience.[5] *See Maldonado v. Houstoun*, 256 F.3d 181, 187–88 (3d Cir. 2011) ("The fee schedule established by Community Legal Services . . . [is] a fair reflection of the prevailing market rates in Philadelphia.").

With respect to Mr. Horowitz's rate, the Court concludes that $350 is not reasonable. Mr. Horowitz has less than five years of legal experience. As such, the Community Legal Services

---

[5] The Community Legal Services attorney fees schedule provides a range of hourly rates of $435 to $505 for an attorney with sixteen to twenty years of experience. Community Legal Services Attorney Fees Schedule (updated September 12, 2014), *available at* https://clsphila.org/about-cls/attorney-fees.

attorney fees schedule suggests a maximum hourly rate of $250.[6] The Court concludes that plaintiff has failed to produce evidence that Mr. Horowitz has special experience applicable to this case or that the relatively simple issues presented warrant an increased rate. The Court concludes that $250 per hour is an appropriate reasonable market rate for Mr. Horowitz's work on this case.

The Court next turns to the time billed by each attorney on this case. Having reviewed the time records submitted, the Court concludes that the 14.4 hours billed by Mr. Swartz is appropriate. However, the Court concludes that the 63.5 hours billed by Mr. Horowitz is excessive, particularly given the relatively routine nature of the case. Specifically, the Court will eliminate the following time entries as redundant or otherwise unnecessary:

- 4.4 hours spent by Mr. Horowitz interviewing and preparing a third-party witness, given that the witness did not appear at the damages hearing.
- 11.5 hours spent attending hearings also attended by Mr. Swartz.
- 2.2 hours spent attending meetings with Mr. Swartz to review documents prior to submission.

Thus, the Court will reduce Mr. Horowitz's time billed on the case by 18.1 hours to a total of 45.4 hours.

Based on the above, the Court determines that a fee of $18,550 for plaintiff's counsel is appropriate in this case, based on $7,200 for Mr. Swartz (14.4 hours at $500 per hour) and $11,350 for Mr. Horowitz (45.4 hours at $250 per hour).

## VI.   CONCLUSION

The Court enters judgment in favor of plaintiff and against defendant in the total amount

---

[6] For an attorney with two to five years of experience, Community Legal Services suggests a range of hourly rates of $200 to $250.

of $107,904, consisting of back pay in the amount of $7,904, compensatory damages in the amount of $50,000, and punitive damages in the amount of $50,000. The Court awards counsel for plaintiff attorneys' fees pursuant to 42 U.S.C. § 1988 in the amount of $18,550.